NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DAVID BAYLOR, | : | |
| | : | Civil Action No. 17-1435 (KM) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ATTORNEY GENERAL OF THE | : | |
| STATE OF NEW JERSEY, *et al.*, | : | |
| | : | |
| Respondents. | : | |

APPEARANCES:

David Baylor
*Pro Se*
429701
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625
            Petitioner,

Christopher W. Hsieh
Chief Assistant Prosecutor
Passaic County Prosecutor's Office
401 Grand Street
Paterson, NJ 07505
            On behalf of Respondents.

**McNulty, United States District Judge**

## I.      INTRODUCTION

Petitioner David Baylor, a prisoner currently confined at New Jersey State Prison in

Trenton, New Jersey, has filed a petition for a writ of habeas corpus. (DE 1.) For the reasons

explained in this Opinion, the Court will deny the petition and will deny a certificate of appealability.

## II.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division on Petitioner's direct appeal.[1]

> With money provided by the Federal Bureau of Investigation (FBI), Lorenzo Gonzalez (Gonzalez) operated an after-hours club called "Kings Court" in Paterson. The club was intended to attract certain "high level" gang members who the FBI was tracking and investigating.
>
> On the evening of December 13, 2005, Beatriz Hernandez (Beatriz) went to a club in Passaic with Debbie Aponte-Tovar (Aponte-Tovar) and two men. Defendant was at the club with Hamid Shabazz (Shabazz) and Reginald Barris (Barris). Beatriz told them that there would be gambling and a lot of money at Kings Court and they should rob that establishment. Between 1:55 and 2:30 a.m., Beatriz and Aponte-Tovar found Gonzalez and two men playing pool. A short while later, defendant arrived with Shabazz, Barris and Maurice Fabor (Fabor). Others were present at Kings Court, including Michael Almonte (Almonte), Ralph Hernandez (Hernandez), Jesus Gonzalez (Jesus), John Melendez (Melendez) and Tara Woods (Woods).
>
> After a while, Beatriz moved to the dice table. She observed about $5000 on the table. Beatriz left the table and confirmed with defendant and Shabazz that the robbery was going to take place. Barris became very intoxicated and went outside. Defendant and Shabazz followed. Beatriz thereafter opened the back door and defendant and Shabazz came back inside. They were both wearing black masks and defendant had a gun.
>
> Gonzalez was standing at the gaming table with Hernandez and Beatriz. When Gonzalez stood up to count his money, he heard a loud bang. Defendant had shot Jesus. Defendant then walked over to the pool table where Woods was playing. She asked defendant not to kill her, but he told her to "[s]hut the fuck up" and shot her in the head. Beatriz asked defendant what he was doing. Defendant did

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

not respond. He then shot Melendez and Hernandez. Beatriz and Aponte-Tovar ran out the back door of the club, met Fabor who was already outside, and got into Beatriz's truck and drove away. Beatriz headed towards the highway but stopped to pick up defendant and Shabazz. Shabazz told her to drop them off near a store in Paterson. According to Beatriz, during the drive, defendant and Shabazz joked about the shooting and talked about dividing the money. Defendant and Shabazz offered Beatriz some money but she refused to accept it.

Officers of the Paterson Police Department (PPD) were dispatched to Kings Court. Emergency personnel confirmed that all four victims of the shootings were dead. Gonzalez told the police that he believed the suspects were associated with the Bloods gang. The police showed Gonzalez photographs of certain known gang members, and Gonzalez identified Barris, Hernandez and Aponte-Tovar as persons who were present at the club that evening. Gonzalez testified that he told the police defendant was the shooter.

Beatriz thereafter spoke on the phone with the PPD detectives. Later, she went to police headquarters and provided the detectives with a statement denying that she conspired to commit the robbery. The detectives showed Beatriz certain photographs and she identified defendant, Barris and Shabazz as persons involved in the incident. She identified defendant as the shooter. Beatriz also told the detectives that Fabor was present at the club on the night of the shootings.

Aponte-Tovar left the state after the shootings. She returned after she was told that the PPD knew she was at Kings Court at the time of the shootings and knew where she could be located. Aponte-Tovar identified photographs of defendant, Barris, Shabazz and Beatriz as persons involved in the incident. In addition, Almonte informed the police that he was a witness to the shootings. He was shown photographs of gang members and he identified Barris as one of the perpetrators of the robbery.

On December 16, 2005, criminal complaints were filed against defendant, Barris and Shabazz. Shabazz was arrested in Passaic on December 18, 2005. At the request of the Paterson police, Shabazz phoned defendant, who told Shabazz that the police had been at his house. The police overheard the conversation. On December 20, 2005, defendant turned himself in at police headquarters and he was arrested.

> Defendant was informed of his *Miranda* rights. He agreed to waive those rights and give the detectives a statement. Defendant acknowledged that he had been at Kings Court on the night of the shootings. He said that he went to the restroom and when he returned, he heard gunshots. The detectives asked defendant why three people would "point the finger" at him, and he responded that it was "[b]ecause I'm Blood, I'm Blood and I have respect within this Blood thing."
>
> Defendant said that Kings Court was a "gang place" but he denied seeing any members of the Bloods gang in the club on the night of the shootings. In addition, defendant denied that Fabor was a member of the Bloods. He stated that he was willing to "take the weight" for the shootings because he had "no choice."
>
> The grand jury charged defendant with four counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or N.J.S.A. 2C:11-3(a)(2) (counts one, four, seven, and ten); four counts of first-degree felony murder, N.J.S.A. 2C:15-1(a)(1) and (3) (counts three, six, nine and twelve); unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) count thirteen; possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count fourteen); and certain persons not to have weapons, N.J.S.A. 2C:39-7(b) (count fifteen). Shabazz, Barris and Beatriz also were charged with various offenses.
>
> Defendant was found not guilty on counts six and twelve (charging the robberies of Woods and Melendez, respectively) and thirteen (charging unlawful possession of a weapon) but guilty on all other charges. After merging certain offenses, the court imposed four consecutive life sentences without parole for the murders; two concurrent twenty-year sentences for the robberies, with periods of parole ineligibility as prescribed by the No Early Release Act, N.J.S.A 2C:43-7.2; and a consecutive ten-year term for certain persons not to have weapons, with a five-year period of parole ineligibility. The court filed a judgment of conviction dated September 19, 2008.

*State v. Baylor*, 34 A.3d 801 (N.J. Super. Ct. App. Div. Dec. 29, 2011).

The Appellate Division affirmed Petitioner's conviction in a published opinion. *Id.* at

814. The New Jersey Supreme Court denied Petitioner's petition for certification. *State v.*

*Baylor*, 34 A.3d 801 (N.J. 2012). Petitioner then filed a Petition for Post-Conviction Relief

("PCR") in the trial court, which was denied on January 24, 2014. (DE 4-39 at 66-68, 69-79.)

The Appellate Division affirmed the PCR court's decision on April 5, 2016. *State v. Baylor*, A-2928-13T2, 2016 WL 1312634 (N.J. Super. Ct. App. Div. Apr. 5, 2016). The New Jersey Supreme Court denied Petitioner's petition for certification on June 24, 2016. *State v. Baylor*, 141 A.3d 299 (N.J. 2016).

Petitioner filed this Petition for federal habeas relief on February 28, 2017. (DE 1.) Respondents filed an Answer on April 3, 2017. (DE 5.) Petitioner filed a reply on May 26, 2017. (DE 10.) The matter is fully briefed and ready for disposition.

## III. STANDARD OF REVIEW

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court has "no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Parker v. Matthews*, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)). Clearly established law for purposes of § 2254(d)(1) includes only "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412

5

(2000). Moreover, a federal court reviewing the state court's adjudication under § 2254 (d)(1) must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). Finally, "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

## IV.    ANALYSIS

The Petition raises five grounds for relief:

1. The Petitioner's recorded custodial statement to law enforcement was in violation of his Fifth Amendment right against self-incrimination.

2. The trial court's erroneous jury instructions were in violation of his right to a fair trial.

3. The trial court erroneously admitted Petitioner's recorded telephone conversation with his co-defendant despite its highly prejudicial nature.

4. The trial court erroneously permitted prejudicial evidence of Petitioner's gang affiliation.

5. Petitioner was erroneously sentenced to life without parole in violation of the Ex Post Facto Clause and his right to a fair trial and due process.

For the reasons explained *infra*, this Court finds that Petitioner's claims do not warrant granting federal habeas relief.

### A. Claim that the Petitioner's recorded statement to law enforcement was taken in violation of his Fifth Amendment right against self-incrimination

Petitioner asserts that the trial court erroneously admitted his custodial statement to detectives despite its being a product of coercive interrogation tactics and obtained despite his invoking his right to silence. (DE 1-3 at 1-5.) He argues that the questioning detectives employed

6

coercive tactics such as presenting themselves as amiable to Petitioner, making multiple

misrepresentations to Petitioner including that he was facing the death penalty, and representing

that they were aware of evidence and witnesses which they were not in fact aware of. (*Id.* at 3-4.)

Petitioner also argues that the detectives should have recognized that he was invoking his right to

silence when he stated he could not identify the shooter. (*Id.* at 4-5.) Petitioner also states that he

had limited education and an extensive criminal background, but he does not further relate that

information to the voluntariness of his statement to the police. (*Id.* at 3.)

This very issue was raised in Petitioner's direct appeal to the Appellate Division. That

Court rejected it as follows:

> Here, the trial court conducted a hearing on defendant's motion to
> suppress his videotaped statement to the police. The record of that
> proceeding indicates that defendant voluntarily presented himself at
> police headquarters after a warrant was issued for his arrest. The
> detective advised defendant of his *Miranda* rights. Defendant
> confirmed in writing that he understood his rights. He waived his
> rights and provided the detectives with a statement that was
> videotaped. The trial court found that, considering the totality of the
> circumstances, defendant made his statement voluntarily.
>
> Defendant argues, however, that his statement should not be
> considered voluntary because the detectives subjected him to what
> he says was "psychological manipulation and coercion." Defendant
> asserts that the detectives presented themselves as friends who cared
> about his welfare; erroneously informed him that he faced the death
> penalty; reduced him to tears by applying "unrelenting pressure" on
> him to confess and/or name the shooter; attributed statements to him
> that were untrue and intended to "trick" him into making inculpatory
> statements; and lied about the evidence and witnesses against him.
>
> The trial court found that the detectives did not subject defendant to
> any coercion, pressure or threats. Moreover, law enforcement
> officers may employ deception or trickery in an interrogation of a
> suspect unless such deception or trickery was calculated to produce
> an untruthful confession or was offensive to due process. *State v.
> Manning*, 165 N.J. Super. 19, 30-31, 397 A.2d 686 (App. Div.
> 1978), *certif. denied*, 81 N.J. 358, 407 A.2d 1231 (1979). The trial
> court found that the police engaged in some deception but it did not

7

result in defendant making a statement he would not have otherwise made voluntarily.

The trial court's findings are binding on appeal if supported by sufficient, credible evidence. *State v. Elders*, 192 N.J. 224, 243, 927 A.2d 1250 (2007) (citing *State v. Locurto*, 157 N.J. 463, 474, 724 A.2d 234 (1999). We are satisfied that the record supports the court's findings and its conclusion that defendant's statement was voluntary.

Defendant additionally argues that the investigating detectives failed to honor his "request" to terminate the interrogation. Defendant did not raise this argument in the trial court. In any event, the argument is without merit.

An individual may waive his or her *Miranda* rights and proceed with questioning, but "a decision to proceed, however, is not irrevocable." *State v. Burno-Taylor*, 400 N.J. Super. 581, 587, 948 A.2d 717 (App. Div. 2008). "'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *Ibid.* (quoting *Miranda, supra*, 384 U.S. at 473-74, 86 S.Ct. at 1627-28, 16 L.Ed.2d at 723 (footnote omitted)). "New Jersey courts have recognized that even an ambiguous indication of a desire to remain silent is sufficient to require that questioning cease." *Id.* at 590, 948 A.2d 717. "[A] request to terminate an interrogation must be honored 'however ambiguous.'" *State v. Bey*, 112 N.J. 45, 64-65, 548 A.2d 846 (1988) (quoting *State v. Kennedy*, 97 N.J. 278, 288, 478 A.2d 723 (1984)).

Defendant contends that when he told the detectives that he could not name the shooter because of his affiliation with the Bloods gang, he was "explain[ing] that he would not discuss the incident further." Defendant additionally contends that when he told the detectives he could not give them the name of the shooter, he was asserting his right to silence and "it was incumbent upon the detectives to either end the interrogation, or, at least, ask if [defendant] wanted [to] stop."

We are convinced, however, that defendant's statement cannot reasonably be interpreted as an assertion of his right to remain silent. Defendant never told the detectives that he wanted the interrogation to stop. He never stated that he wanted to consult with an attorney. He never said that he did not wish to discuss the matter further. We are satisfied that defendant's statement that he could not name the

shooter because of his gang affiliation was not an assertion of a right
to remain silent.

*Baylor*, 34 A.3d at 806-808.

The Fifth Amendment to the United States Constitution provides that no person "shall be

compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Under

*Miranda v. Arizona*, 346 U.S. 436 (1966), a statement taken during a custodial interrogation is

only admissible at a criminal defendant's trial where that defendant was advised of his rights and

has made a knowing, intelligent, and voluntary waiver of his rights. 346 U.S. at 444; *see also*

*Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Sweet v. Tennis*, 386 F. App'x 342, 345

(3d Cir. 2010). "[T]he Fifth Amendment proscribes only self-incrimination obtained by a

genuine compulsion of testimony." *United States v. Washington*, 431 U.S. 181, 187 (1977)

(internal quotation marks and citations omitted).

"[W]hen a confession challenged as involuntary is sought to be used against a criminal

defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession

was in fact voluntarily rendered." *Lego v. Twomey*, 404 U.S. 477 (1972). Here, the trial court

convened a suppression hearing before determining that the statement was voluntary. (D.E. Nos.

4-1 – 4-2.) At the hearing, the interviewing detectives testified about the interview and the trial

court viewed the video-recorded interview in its entirety. (DE 4-1 at 9.) The detectives testified,

*inter alia*, that Petitioner was advised of his *Miranda* rights and signed a waiver form which was

entered into evidence at the hearing. (*Id.* at 7-8.) The detectives and the trial court acknowledged

that the interviewing detectives did employ some deception about issues such as his potential

sentence and information they had obtained from witnesses, in the course of their unsuccessful

attempts to obtain a confession from Petitioner. (DE 4-2 at 29.) The trial court noted that

although Petitioner did not confess to the crimes, there were portions of the interview which the

9

defense would understandably consider helpful to the prosecution. (*Id.*) All the facts and circumstances surrounding the recorded statement were heard by the trial judge, who ultimately ruled that the statement was voluntary. (*Id.* at 27-30.)

Petitioner has not established that any police activity resulted in a coerced confession. Petitioner did not confess to any crime. While he submits that he only had a ninth-grade education, he also acknowledges that he had had significant contact with the criminal justice system by that point in his life. Moreover, law enforcement displaying a friendly disposition towards the subject does not rise to the level of psychological manipulation that would render a confession unconstitutional. *See Miller v. Fenton*, 798 F.2d 598,607 (3d Cir. 1986) (citations omitted). Petitioner has failed to demonstrate that his "will was overborne and his capacity for self-determination critically impaired." *Colorado v. Spring*, 479 U.S. 564, 547 (1987) (citations omitted).

As to Petitioner's claim that the detectives continued to question him after he asserted his right to silence cannot be credited. The *Miranda* rule requires that law enforcement cease questioning if the subject invokes his right to counsel or right to remain silent at any point during the interview. *Id.* at 388. Petitioner argues that by stating to the detectives that he was unable to identify a shooter, he was asserting his right to silence. This statement clearly does not qualify as an unambiguous invocation of his right to remain silent. *See Berghuis*, 560 U.S. at 382 ("If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong.") (internal quotation marks and citations omitted). Indeed, it does not even rise to the level of an equivocal invocation of that right.

10

Considering the facts as determined by the state court, the Court is satisfied that Petitioner knowingly and voluntarily provided a statement. Furthermore, at no time during the questioning did Petitioner invoke his right to remain silent. Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Habeas relief is thus denied.

## B. Claim that the trial court's erroneous jury instructions deprived Petitioner of his Fourteenth Amendment right to a fair trial

Petitioner next submits that the trial court delivered several jury instructions that were incomplete statements or misstatements of the law, thus violating his right to a fair trial. (DE 1-3 at 7-13.) He argues: that the trial court omitted portions of the robbery instruction (*Id.* at 5); that the trial court erroneously omitted portions of the instruction on eyewitness identification (*Id.* at 7); that the trial court limited its instruction on how to evaluate a defendant's statement to Petitioner's videotaped statement with detectives, but should have also applied it to his recorded telephone conversation with his co-defendant (*Id.* at 7-8); the trial court misstated the instruction on how the jury could not consider a co-defendant's guilty plea against Petitioner; the trial court misstated the jury instruction on how the jury could consider any inconsistencies in Petitioner's videotaped statement to investigators; and that the trial court failed to provide an instruction on prior inconsistent statements. (*Id.* at 11-13.)

To show that a jury instruction violated due process, Petitioner must show "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal citation and quotation marks omitted). The instruction "must be considered in the context of the instructions as a whole and the trial record." *Id.* at 191 (internal citation and quotation marks

11

omitted). Moreover, "it is not enough that there is some slight possibility that the jury misapplied the instruction, the pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (internal citation and quotation marks omitted). "In other words, the inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel delivered to the jurors before they retired to deliberate, and the charge as a whole." *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (citing *Waddington*, 555 U.S. 179).

## Robbery Instruction

Petitioner argues that the trial court omitted a portion of the New Jersey Model Jury Instruction on robbery that should have been provided in order for the jury to properly determine whether the evidence supported the guilty verdicts on the robbery counts. (DE 1-3 at 5-6.) A state witness, he says, speculated that Petitioner committed the crimes in question because one of the individuals on the premises was a Federal Bureau of Investigation ("F.B.I.") informant. (*Id.* at 6.) Petitioner therefore submits that because there could have been motives other than a desire to commit a theft, the portion of the model jury instruction which provides that, the intent to commit theft must precede the use of force should have been provided. He also argues that the jury's not guilty verdicts with respect to victims Melendez and Woods support this argument.

This very issue was raised in Petitioner's direct appeal before the Appellate Division, which rejected it:

> Defendant contends that the trial court incorrectly omitted the following portion of the model jury charge on robbery:
>
> To find the defendant guilty of robbery, the intent to commit theft must precede or be coterminous with the use of force. In other words, the defendant must have formed the intent to commit a theft before or during his/her use of force. If you find the defendant

12

formed the intent to commit a theft after his/her use of force, then
he/she cannot be found guilty of robbery[.]
[*Model Jury Charge (Criminal),* "Robbery" (2009).]

Defendant argues that this portion of the charge "was critical to a
fair determination" of the charges.

In support of this argument, defendant relies upon *State v. Lopez,*
187 *N.J.* 91, 900 *A.*2d 779 (2006). In *Lopez,* the defendant struck
and killed the victim. *Id.* at 93, 900 *A.*2d 779. Thereafter, the
defendant decided to steal the victim's jewelry. *Ibid.* The Court
observed that "without the intention to steal evidenced by a theft or
attempted theft, there can be no robbery." *Id.* at 98, 900 *A.*2d 779.

The Court held that our robbery statute "requires that the threats of
violence be carried out in furtherance of the intention to commit a
theft." *Id.* at 101, 900 *A.*2d 779.

*Lopez* does not support defendant's argument in this case. Beatriz
testified that she and the defendant had discussed committing the
robberies at Kings Court before defendant arrived there, and that
she took steps to facilitate the robberies by opening the back door
so that defendant and Shabazz could return to into the club. Unlike
*Lopez,* the evidence presented here indicated that defendant formed
the intent to commit the thefts before he entered Kings Court, and
he had the intent to commit the thefts when he shot Hernandez and
Gonzalez. *Ibid.* In light of the evidence, the omission of the portion
of the robbery charge quoted above was not plain error.

Defendant nonetheless argues that the trial court's instruction
constitutes plain error because the jury determined that he did not
commit the robberies of Woods and Melendez. Defendant asserts
that if the omitted section of the charge had been included, he
might have been acquitted of the robberies of Hernandez and
Gonzalez. We disagree. The jury's findings can be rationally
explained by the fact that the evidence established that Hernandez
and Gonzalez were playing dice at the gaming table where Beatriz
observed the money, while Woods and Melendez were at the pool
table.

We are therefore satisfied that the omission of the aforementioned
portion of the robbery charge was not an error "clearly capable of
producing an unjust result." *R.* 2:10–2.

*Baylor,* 34 A.3d at 808-809.

Notwithstanding any testimony from state witnesses about a possible non-theft related motive for Petitioner's actions at the after-hours club, the record reflects that there was also testimony that theft was a motive, and a preexisting one.[2] State witness,Beatriz Hernandez, testified that she was the one who advised Petitioner and his co-defendants that there was gambling taking place at the after-hours club and that there would be potentially significant sums of money that the group could rob. (DE 4-5 at 22.) Moreover, Hernandez testified that she witnessed Petitioner and his co-conspirator in her vehicle as they drove away from the after-hours club dividing cash that was stained with blood. (*Id.* at 41-42.) Notwithstanding Petitioner's protestations, the State presented ample evidence that Petitioner and his co-conspirators did have a plan to steal money before they arrived at the club. Nor did the acquittal as to victims Woods and Melendez suggest otherwise. As the state court pointed out, the evidence showed that the visible amounts of cash were at the dice table where victims Gonzalez and Hernandez were located, and not at the pool table where victims Woods and Melendez were located. There was a reasonable basis, then, two distinguish between the two sets of victims as to the robbery counts. (*Id.* at 31, 33, 37-38.)

Petitioner has not demonstrated that any omission of a portion of the robbery jury instruction "infected the entire trial" in any way. Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Habeas relief is thus denied.

---

[2] The Court has reviewed Lorenzo Gonzalez's testimony in its entirety. Gonzalez testified that he was running the after-hours club using funds from the F.B.I., and that he may have speculated immediately after the incident that that was a possible motive for the crimes. (D.E. Nos. 4-8 at 2-3, 4-9 at 25.)

14

<u>Identification Instruction</u>

Petitioner next submits that that the trial court erroneously omitted portions of the

instruction on how jurors should evaluate an eyewitness identification. (DE 1-3 at 7.) Petitioner

submits that because his defense was mistaken identification, the instruction was particularly

critical. (*Id.*)

This very issue was raised in Petitioner's direct appeal before the Appellate Division,

which denied it:

> Here, the trial court instructed the jury on identification by stating
> that when:
>
> evaluating an identification you should consider the observations
> and perceptions on which each identification is based and the
> particular witness's ability to make those observations and
> perceptions. If you determine that the out of court identification of
> a particular ... witness is not reliable you may still consider the
> witness's in court identification of the defendant if you find it to be
> reliable.
>
> The court further instructed the jury on the factors that are relevant
> to the reasonableness of the identification, including the witness's
> opportunity to view the suspect; the witness's degree of attention at
> the relevant time; and the certainty of the identification. The court
> told the jury to consider any inconsistencies or discrepancies in any
> identifications, as well as any other factors that the jury deemed
> relevant.
>
> Defendant argues that the instructions were erroneous because the
> court failed to instruct the jury as follows:
>
> Although nothing may appear more convincing than a witness's
> categorical identification of a perpetrator, you must critically
> analyze such testimony. Such identifications, even if made in good
> faith, may be mistaken. Therefore, when analyzing such testimony,
> be advised that a witness's level of confidence, standing alone, may
> not be an indication of the reliability of the identification.
>
> [*Model Jury Charge (Criminal)*, "Identification: in-court and out-
> of-court identifications" (2009).]

> Defendant claims that the omission of this section of the model
> charge was plain error because identification was a significant
> issue in the case. Again, we disagree.
>
> As noted, the court instructed the jury to consider the identification
> testimony and determine whether the identifications were reliable.
> The court's failure to instruct the jury that some identifications may
> be mistaken, even when made in good faith, was erroneous but the
> error was not "clearly capable of producing an unjust result." *R.*
> 2:10–2.
>
> We note that Beatriz and Gonzalez, who both knew defendant
> from prior encounters, had identified defendant as the perpetrator
> of the charged offenses prior to, and at, trial. The jurors obviously
> found Beatriz's and Gonzalez's identification testimony reliable.
> We are convinced that it is unlikely the jury would have reached a
> different conclusion if the trial court had included the omitted
> language in its charge.

*Baylor,* 34 A.3d at 809.

The trial record reflects that the jury received instructions on how to evaluate an

eyewitness identification as well as a list of factors that they may consider when evaluating the

identification. (DE 4-23 at 36-37.) Furthermore, the trial court added that the "[t]he ultimate

issue of trustworthiness of both the in court and out of court identification are for you to decide."

(*Id.*) Petitioner nonetheless submits that the jury should have been instructed that identifications

"may be mistaken." (DE 1-3 at 7.) I cannot hold that failure to deliver every sentence of the

model instruction constitutes a violation of due process. Any arguable error, moreover, was

harmless, as the state court found. Eyewitness Beatriz Hernandez testified that she was familiar

with Petitioner's appearance before the crime occurred; she had previously been with the

Petitioner at another club and they traveled to the after-hours club together. (DE 4-5 at 19.)

The trial court's instructions to the jury when viewed as a whole did not "infect[ ] the

entire trial." Consequently, the state court's decision was not an unreasonable application of

clearly established federal law. Habeas relief is thus denied.

<u>Instruction on Defendant's Statements</u>

Petitioner next submits that the trial court limited its instruction on how to evaluate

defendant's statements to Petitioner's recorded interview with detectives, but should have also

applied it to his telephone conversation with his co-defendant that was overheard by law

enforcement personnel. (DE 1-3 at 7-8.) Petitioner also submits that the trial court erroneously

instructed the jury that "if they found portions of the statement knowingly false, they could infer

Petitioner's consciousness of guilt." (*Id.* at 9-11.)

This very issue was raised in Petitioner's direct appeal before the Appellate Division,

which rejected it:

> The trial court instructed the jury that it must determine whether
> defendant made the statements attributed to him, and whether all or
> part of those statements were credible. Defendant nevertheless
> argues that the court erred by failing to specify that this instruction
> applied not only to defendant's formal statement to the police, but
> also to statements he made to Shabazz during a telephone
> conversation that the police overheard. We disagree.
>
> Defendant told Shabazz that he was going to get his gun and
> bulletproof vest and "party with the cops." However, during the
> interrogation, the police asked defendant about his statements to
> Shabazz. Defendant acknowledged making the statements,
> although he claimed that it was a "bluff." We are satisfied the
> court's instruction covered defendant's videotaped statement as
> well as the statements he made to Shabazz.
>
> Furthermore, defendant's statements to Shabazz were not critical to
> the State's case. Indeed, there was extensive evidence that
> defendant committed the charged offenses. Therefore, the court's
> failure to specifically state that its instruction applied to
> defendant's statement to the police as well as his statements to
> Shabazz was not error, let alone plain error.
>
> Defendant additionally contends that the trial court erroneously
> amended its instruction to indicate that if any portion of
> defendant's statement was knowingly false, the jurors could draw
> an inference of his consciousness of guilt. The record does not
> support this contention. The court told the jury that, if it found that

> defendant was not telling the truth, it could consider that evidence
> along with all of the other evidence in the case.
>
> Defendant also argues that the amended instruction "eviscerated"
> the portion of the charge in which the jury was told it could
> disregard defendant's statement if the jury found it was not worthy
> of belief.
>
> This argument is without sufficient merit to warrant discussion. *R.*
> 2:11–3(e)(2).

*Baylor,* 34 A.3d at 809-10.

During the trial court's charge to the jury, it provided an instruction on how to evaluate a

defendant's statement, a relevant portion of which is as follows:

> There is for your consideration in this case a videotaped statement,
> allegedly, made by the defendant David Baylor at Paterson Police
> Headquarters on December 20th, 2005. It is your function to
> determine:
>
> First, whether or not the statement was actually made by the
> defendant. And - -
>
> Second, if made, whether the statement or any portion of it is
> credible.

(DE 4-23 at 38.)

At Petitioner's trial, Detective Pablo Maute of the Paterson Police Department testified

about his first post-arrest meeting with Petitioner's co-defendant Hamid Shabazz. (DE 4-12 at

82.) At that meeting, Shabazz complied with Maute's request to contact Petitioner, who was then

still at large. Maute overheard Petitioner tell Shabazz by telephone "that the police were around

his house and that he was getting ready to put on his bullet proof vest, grab his gun, and party

with the cops." (*Id.* at 92.) Maute further testified that during Petitioner's recorded custodial

interrogation he asked Petitioner about this particular conversation with Shabazz. (*Id.* at 93.)

Petitioner conceded that it was his voice on the call but claimed that his comments were just a

18

"bluff." (*Id.*) Following this testimony of Maute, the recording of Petitioner's interview was played for the jury. (*Id.* at 119.)

I agree with the Appellate Division that the instruction would have been understood to cover both defendant's videotaped statement and the statements he made to Shabazz, even if this was not explicitly stated. I also agree, however, that any error was surely harmless, in that the statements to Shabazz were not central to the government's case, which contained extensive evidence of Petitioner's guilt.

Therefore, Petitioner has not demonstrated how the trial court's omission of an explicit instruction on how to consider his conversation with Shabazz merits federal habeas relief. *Waddington*, 555 U.S. at 191.

Petitioner's additional claim that the trial court instructed the jury to infer Petitioner's guilt if any portion of his statement was knowingly false is belied by the record. The relevant portions of the trial court's instruction is as follows: "If you find that the statement was made and that parts or all of the statement is credible you may give weight you think appropriate to the portion of the statement you find to be truthful and credible." (DE 4-23 at 38.)

Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Habeas relief on these grounds is therefore denied.

### Evaluating Co-Defendant's Guilty Plea

Petitioner next submits that the trial court misstated the instruction on how the jury could not consider a co-defendant's guilty plea against him. (DE 1-3 at 9.)

This very issue was raised in Petitioner's direct appeal before the Appellate Division, which rejected it:

> The trial court instructed the jury that Beatriz had been charged
> with certain offenses arising from this incident, including felony

19

murder, robbery while armed, weapons charges, and conspiracy to commit robbery. The court told the jury that Beatriz pled guilty to the conspiracy charge but her plea could only be used in determining her credibility as a witness.

The court further instructed the jurors that evidence regarding Beatriz's plea could not be used as evidence "that defendant is guilty of the crimes that [Beatriz] is charged with." Defendant did not object to this portion of the charge.

He argues, however, for the first time on appeal, that the trial court should have told the jury that the evidence of Beatriz's plea could not be used as evidence that *defendant* was guilty of the offenses that *he* was charged with. We are convinced that, although the trial court mistakenly referred to Beatriz rather than defendant in its instruction, the error was harmless.

The court's instruction informed the jury of the limited purpose to which Beatriz's guilty plea could be used. The court did not, however, instruct the jury that it could use Beatriz's plea as evidence *defendant* was guilty of any of the crimes with which he was charged. Moreover, as we stated previously, there was extensive evidence indicating that defendant committed the charged offenses. Thus, the error in the charge was not an error "clearly capable of producing an unjust result." *R.* 2:10–2.

*Baylor*, 34 A.3d at 810.

At trial, Petitioner's co-conspirator, Beatriz Hernandez testified for the state. Hernandez

provided that she, too, was charged with several offenses, including felony murder and

eventually pled guilty to conspiracy to commit robbery. (DE 4-5 at 47.) Petitioner argues that the

trial court misstated the instruction on how Hernandez's guilty plea could be considered.

The trial court provided the following instruction as it relates to Hernandez's guilty plea:

Beatrice [3] Hernandez was indicted for felony murder, robbery while armed, weapons, and conspiracy to rob. Some of the crimes that the defendant David Baylor is on trial for. Beatrice Hernandez has pled guilty to one of those charges, namely conspiracy to commit robbery and has testified on behalf of the State.

---

[3] Spelling of her name as it was transcribed in the trial court record.

> Evidence of Beatrice Hernandez's plea of guilty may be used only in determining the credibility or believability of this witness's testimony.
>
> As I said a jury has a right to consider whether a person who has mitted - - who has admitted she failed to comply with society's rules would be more likely to ignore the oath requiring truthfulness on the witness stand then a person who has never been convicted or pleaded guilty to a crime.
>
> You may consider such evidence only with all the other factors that I mentioned previously in determining the credibility of a witness. However, as you may not use Beatrice Hernandez's plea of guilty as evidence that this defendant is guilty of the crimes that Beatrice Hernandez is charged with.

(DE 4-23 at 39.)

The trial court misstated the instruction by stating, the jury may not use Hernandez's guilty plea as evidence that Petitioner is guilty of crimes Hernandez was charged with, rather than stating crimes that defendant (*i.e.,* Petitioner Baylor) *was charged with.* This was surely a slip of the tongue, but not a fatal one. The trial judge did state that Hernandez's guilt could be considered *only* in determining her credibility, which made the point adequately, if not ideally.

The trial court's instruction did not "so infect[] the entire trial that the resulting conviction violated due process." The state court's decision was not an unreasonable application of clearly established federal law. Moreover, in light of the evidence presented, any error was surely harmless. Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Habeas relief is thus denied.

### Failure to Instruct the Jury on Inconsistent Statements

Petitioner's final jury instruction-related claim is that the trial court failed to provide an instruction on prior inconsistent statements. (DE 1-3 at 11-13.) He argues that state witnesses, Beatriz Hernandez and Lorenzo Gonzalez, both gave testimony that was inconsistent with their

21

prior statements. (*Id.* at 12-13.) Furthermore, Petitioner appears to be arguing that Hernandez's

trial testimony was not credible, because she was minimizing her own culpability in the

conspiracy and that Gonzalez was attempting to be financially compensated by the F.B.I.

This very issue was raised in Petitioner's direct appeal before the Appellate Division,

which rejected it:

> Defendant contends that the trial court erred by failing to instruct
> the jury on prior inconsistent statements. He claims that Beatriz
> and Gonzalez both gave pre-trial statements that were inconsistent
> with their trial testimony.
>
> We are convinced that the absence of the instruction was not plain
> error. Here, the trial court told the jury that, in assessing the
> credibility of all of the witnesses, it should consider whether any
> witness "was shown to have made any inconsistent or
> contradictory statement[.]"
>
> That charge clearly covered any prior inconsistent statements by
> Beatriz and Gonzalez. Furthermore, defendant has not established
> that there were any significant differences between Beatriz's and
> Gonzalez's trial testimony and their prior statements.
>
> We are therefore satisfied that, while the prior inconsistent charge
> should have been given, its absence was not an error "clearly
> capable of producing an unjust result." *R.* 2:10–2.

*Baylor,* 34 A.3d at 810-11.

As to Petitioner's claims about Beatriz Hernandez's testimony, he provides that she

previously told law enforcement that Petitioner threatened her with a gun to drive them away

from the crime scene. (DE 1-3 at 12.) At trial, Petitioner's attorney cross-examined Ms.

Hernandez about her statements to police, and she testified that Petitioner never threatened her to

drive them anywhere. (DE 4-6 at 22-23.) Additionally, trial counsel cross-examined Lorenzo

Gonzalez about his prior statements to law enforcement, where he informed them that the

shooter was completely masked and that he did not hear anyone speaking during the commission

of the crime. Trial counsel also asked Gonzalez about his recollection of whether he told the police that the suspects made any statements or others spoke to them during the course of the armed attack. (DE 4-9 at 26-28.) Gonzalez repeatedly replied that it had been over two years since the incident and he could not recall all of the details nor what he told the police shortly after it occurred. (DE 4-8 at 35.) Gonzalez never unequivocally testified that his prior statements to the police were incorrect. Further, Gonzalez testified that he was focused on surviving the attack and his ability to observe minutia during the actual attack was probably impaired. (*Id.* at 28.)

Notwithstanding Petitioner's claims that both witnesses had ulterior motives for providing their earlier statements to the police, the trial court provided a thorough jury instruction on how to assess witness credibility. (DE 4-23 at 5-6.) In this context, the trial court's omission of a more specific instruction on prior inconsistent statements does not amount to a due process violation. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.") That is especially so given that defense counsel had a full and fair opportunity to cross-examine the witnesses.

Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Habeas relief is thus denied.

### C. Claim that Trial Court Erroneously Admitted Petitioner's Oral Statement Contrary to New Jersey Rules of Evidence

Petitioner next submits that the trial court erroneously admitted Petitioner's statements in the phone call with his co-conspirator, Hamid Shabazz, that was overheard by law enforcement. Petitioner argues that this evidence, which included Petitioner referencing possessing a gun and a

bullet-proof vest, was very prejudicial evidence of other crimes and character evidence. (DE 1-3 at 14.) He also argues that the impact of the evidence could have been mitigated if the court gave a limiting jury instruction *sua sponte*. (*Id.*) He does not submit what that instruction should have entailed.

This very issue was raised in Petitioner's direct appeal before the Appellate Division which rejected it:

> We are convinced that the admission of testimony regarding defendant's statements to Shabazz was not erroneous. Defendant's statements were admissible pursuant to *N.J.R.E.* 803(c)(25) because they were statements against his interest. Moreover, exclusion of the evidence under *N.J.R.E.* 403 was not warranted because any prejudice from the admission of the statements did not "substantially outweigh" their probative value. *N.J.R.E.* 403.

*Baylor,* 34 A.3d at 811.

As noted above, Detective Pablo Maute of the Paterson Police Department testified about his first post-arrest meeting with Petitioner's co-conspirator, Hamid Shabazz. (DE 4-12 at 82.) At that meeting, Shabazz complied with Maute's request to contact Petitioner, who was then still at large. Maute overheard Petitioner tell Shabazz "that the police were around his house and that he was getting ready to put on his bullet proof vest, grab his gun, and party with the cops." (*Id.* at 92.)

Respondents argue and the Court agrees that this claim relies on state evidentiary law and Petitioner has not raised a constitutional ground for relief. (DE 5 at 19-21.) Section 2254 permits habeas relief for a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1997). A state court's interpretation of state evidentiary rules does not meet this requirement, and this Court has no authority to interfere with the state court's ruling. *Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991) (federal court cannot grant habeas relief based on belief

that trial judge interpreted or applied state evidence rule incorrectly); *Shillcutt v. Gagnon,* 827 F.2d 1155, 1158 (7th Cir.1987) (federal court would not entertain argument that state court misconstrued state rule of evidence).

That is not to say that an evidentiary error can never be considered, but it will not warrant habeas relief unless its effect was so pervasive that the petitioner was denied the fundamental right to a fair trial. *See Estelle*, 502 U.S. at 67-70. Here, there was a significant amount of evidence inculpating Petitioner, not the least of which was eyewitness testimony. Therefore the admission of Petitioner's statements to Shabazz, even if erroneous, could not have rendered his trial fundamentally unfair. Petitioner's attack on the state court's application of New Jersey state law does not state a basis for federal habeas relief. Habeas relief is thus denied.

### D. Claim that Court Erroneously Admitted Evidence of Petitioner's Gang Affiliation

Petitioner next submits that the trial court erroneously admitted evidence of his gang affiliation. (DE 1-3 at 14-16.) Petitioner submits that this evidence was prejudicial and was not relevant to the crimes for which he was charged. (*Id.* at 16.)

This very issue was raised in Petitioner's direct appeal before the Appellate Division, which rejected it:

> Defendant's contention that he was prejudiced by the references during the trial to his membership in the Bloods gang also is without merit. Defendant told the police he was a member of the Bloods gang. Furthermore, the record reflects that, during the trial, defense counsel repeatedly raised the issue of defendant's gang membership. Defendant should not be heard to complain that he was prejudiced by the references to his gang membership made during the trial when his own attorney raised that issue and made many of the references himself.

*Baylor,* 34 A.3d at 811.

At Petitioner's trial, evidence of his gang affiliation was raised frequently throughout. As the state court noted, Petitioner's own trial counsel raised his client's gang affiliation. Indeed, Petitioner's defense counsel *relied* on his client's gang affiliation; one defense theory was that state witness Lorenzo Gonzalez lied about Petitioner's involvement because he had an axe to grind against gang members. (DE 4-8 at 50.) Moreover, references to Petitioner's gang affiliation were relevant and could hardly be avoided; they were necessary to explain the type of clientele that frequented the club and how the witness who operated the club was so familiar with many of the club's patrons, including Petitioner.

This alleged error, to the extent it was error at all and not invited by the defense, could not have compromised Petitioner's right to a fair trial. *See Moore v. Illinois*, 408 U.S. 786, 800 (1972) ("[W]e cannot say that the presentation of the [challenged evidence] was so irrelevant or so inflammatory that [defendant] was denied a fair trial.") Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Habeas relief on these grounds is denied.

### E. Claim that Sentence Violated the Ex Post Facto Clause

Finally, Petitioner submits that his sentence violated the Ex Post Facto Clause. (DE 1-3 at 17.) He argues that "[t]here was no separate penalty phase proceeding conducted and the amended statute was applied to the Petitioner's case as though it were in effect at the time the offenses were committed." (*Id.*)

This very issue was raised in Petitioner's direct appeal before the Appellate Division, which rejected it:

> The trial court imposed four consecutive life sentences, without the possibility of parole. Defendant argues that these sentences violate the *Ex Post Facto* Clauses of the Federal and State Constitutions. We disagree.

26

As we stated previously, the murders were committed in 2005. At that time, the criminal code allowed for the imposition of certain sentences for those convicted of murder, including the death sentence. *N.J.S.A.* 2C:11–3(b)(1) (2005) provided that:

Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c. of this section by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

*N.J.S.A.* 2C:11–3(c)(1) (2005) required the court to conduct a separate sentencing proceeding to determine whether the death sentence should be imposed. In addition, the statute provided that the judge or jury must determine whether the State has proven that any aggravating factor exists, and whether the factor or factors outweighs any one or more mitigating factors beyond a reasonable doubt. The statute stated:

(a) If the jury or the court finds that any aggravating factors exist and that all of the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors, the court shall sentence the defendant to death.

(b) If the jury or the court finds that no aggravating factors exist, or that all of the aggravating factors which exist do not outweigh all of the mitigating factors, the court shall sentence the defendant pursuant to subsection b.

(c) If the jury is unable to reach a unanimous verdict, the court shall sentence the defendant pursuant to subsection b.
[*N.J.S.A.* 2C:11–3(c)(3) (2005).]

However, as a result of legislation enacted in 2000, persons convicted of murder, who were eligible for the death penalty under subsection (c) of the statute, but not sentenced to death, could be sentenced to a term of life imprisonment without parole under certain circumstances. *L.* 2000, *c.* 88, (codified at *N.J.S.A.* 2C:11–3(b)(4)). The statute stated:

[i]f the defendant was subject to sentencing pursuant to subsection c. and the jury or court found the existence of one or more aggravating factors, but that such factors did not outweigh the mitigating factors found to exist by the jury or court or the jury was unable to reach a unanimous verdict as to the weight of the factors,

the defendant shall be sentenced by the court to a term of life imprisonment during which the defendant shall not be eligible for parole. [*N.J.S.A.* 2C:11–3(b)(4) (2005).]

In 2007, the death penalty was eliminated. *L.* 2007, *c.* 204. *N.J.S.A.* 2C:11–3(b)(4) was amended to provide, among other things, that persons convicted of murder under subsections (a)(1) or (2), who committed the homicidal act by his or her own conduct, could be sentenced to life imprisonment without the possibility of parole if the jury found that the State has proven, beyond a reasonable doubt, one or more aggravating factors in *N.J.S.A.* 2C:11–3(b)(4).

This case came to trial in 2008. For sentencing purposes, the trial court required the jury to determine as to each murder, whether the State had proven, beyond a reasonable doubt, the existence of one of the aggravating factors in *N.J.S.A.* 2C:11–3(b)(4). No mitigating factors were presented to the jury.

The jury found that the State had proven beyond a reasonable doubt that defendant committed each murder while engaged in the commission of, an attempt to commit, or flight after committing or attempting to commit the murder. The jury also found that the State had proven beyond a reasonable doubt that defendant committed each murder while engaged in the commission, or an attempt to commit, or flight after committing or attempting to commit the robbery. These were aggravating factors under the law in effect in 2005. *See N.J.S.A.* 2C:11–3(c)(4)(g) (2005).

Defendant argues that he could not be sentenced to life imprisonment without the possibility of parole because the jury never found that the aggravating factors outweighed the mitigating factors. He contends that imposition of life sentences without parole based solely on the jury's findings of aggravating factors represents the application of the amendments to the murder statute enacted in 2007. He claims this is a violation of his rights under the Federal and State *Ex Post Facto* Clauses. We do not agree.

As we have explained, the law in effect in 2005 provided that a person convicted of murder shall be sentenced to life without parole if the jury finds at least one aggravating factor, regardless of whether there were any mitigating factors or whether those mitigating factors outweighed the aggravating factor or factors. *See Cannel, New Jersey Criminal Code Annotated,* comment 4 on *N.J.S.A.* 2C:11–3 (2006). We are satisfied that the imposition of those sentences in this case is not an *ex post facto* punishment.

Defendant also argues that he cannot be sentenced to life without parole unless there is a new sentencing proceeding and the jury finds that the aggravating factors outweigh any mitigating factors. In support of this contention, defendant relies upon *State v. Fortin* (*Fortin IV*), 198 *N.J.* 619, 969 *A.*2d 1133 (2009).

In that case, the defendant committed a murder in 1994. *Id.* at 622, 969 *A.*2d 1133. The law in effect at the time permitted the imposition of the death penalty if the State proved beyond a reasonable doubt that one or more aggravating factors were present and they outweighed the mitigating factors. *Id.* at 622–23, 969 *A.*2d 1133. If the State failed to prove those two criteria, the defendant would be subject to life with a thirty-year period of parole ineligibility. *Id.* at 623, 969 *A.*2d 1133.

The defendant was convicted and the death penalty was imposed. *Ibid.* However, the Supreme Court reversed the conviction and ordered a new trial. *Ibid.* (citing *State v. Fortin* (*Fortin II* ), 178 *N.J.* 540, 581, 843 *A.*2d 974 (2004)). The Court noted that in 2000, the Legislature had amended the murder statute to permit the imposition of life sentences without parole in certain capital cases. *Ibid.* (citing *Fortin II, supra,* 178 *N.J.* at 604, 843 *A.*2d 974). The Court held that application of this new law to the defendant would be unconstitutional, unless he waived his rights under the *Ex Post Facto* Clause. *Ibid.* (citing *Fortin II, supra,* 178 *N.J.* at 606, 843 *A.*2d 974).

The defendant was tried again and found guilty. *Fortin IV, supra,* 198 *N.J.* at 624, 969 *A.*2d 1133. However, before the penalty phase in the case, the Legislature again amended the murder statute to eliminate the death penalty and substitute a sentence of life without parole. *Ibid.* The Court noted that, under the amended statute, a life sentence without parole must be imposed if the State establishes beyond a reasonable doubt one or more of the statutory aggravating factors. *Ibid.*

The Court in *Fortin IV* held that sentencing the defendant to life without parole would violate the *Ex Post Facto* Clause. *Id.* at 629, 969 *A.*2d 1133. The Court observed that, under the law in effect when the defendant committed the murder, he could only be sentenced to either death or thirty years to life with a thirty-year period of parole ineligibility. *Ibid.*

The Court stated that, because the trial had not advanced to the penalty phase, the jury did not make findings that could have resulted in the imposition of the death penalty. *Ibid.* The Court said

that, "considering only the non-death sentences, life without parole is a greater sentence than thirty years to life with a thirty-year parole disqualifier." *Ibid.*

We are convinced that *Fortin IV* does not apply here. That case concerned a comparison of the sentences that could be imposed under the murder statute in effect prior to 2000 and those that could be imposed thereafter. In *Fortin IV*, the Court expressly noted that the statutory amendments to the murder statute in 2000 permitted the imposition of life without parole under certain circumstances. *Id.* at 623, 969 *A.*2d 1133 (citing *Fortin II, supra,* 178 *N.J.* at 581, 843 *A.*2d 974). The murder statute in effect when defendant committed the murders required the imposition of life sentences without parole when a jury finds at least one statutory aggravating factor.

In this case, the jury found as to each murder that the State had proven beyond a reasonable doubt two of the statutory aggravating factors. Because the law in effect when defendant committed the murders allowed for the imposition of life sentences without parole based on those findings, the sentences do not violate the *Ex Post Facto* Clauses of the Federal and State Constitutions.

Defendant also relies upon *State v. Cooper,* 410 *N.J. Super.* 43, 979 *A.*2d 792 (App.Div.2009), *certif. denied,* 201 *N.J.* 155, 988 *A.*2d 1177 (2010). In that case, the defendant was convicted of a murder committed in 1993 and sentenced to death. *Id.* at 49, 979 *A.*2d 792. The Supreme Court affirmed the murder conviction and capital sentence. *Ibid.* (citing *State v. Cooper,* 151 *N.J.* 326, 341–42, 700 *A.*2d 306 (1997), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000)). The Court also upheld the death sentence following proportionality review. *Id.* at 49–50, 979 *A.*2d 792 (citing *State v. Cooper,* 159 *N.J.* 55, 116, 731 *A.*2d 1000 (1999)).

Thereafter, defendant filed a petition for post-conviction relief (PCR), which was denied. *Id.* at 50–51, 979 *A.*2d 792. Subsequently, legislation was enacted abolishing the death penalty, and the Governor commuted defendant's sentence to life imprisonment without parole. *Id.* at 51, 979 *A.*2d 792. The Supreme Court remanded the matter to this court for consideration of defendant's appeal from the order denying his PCR petition. *Ibid.*

We stated that the abolishment of the death penalty did not render the appeal moot. *Id.* at 51, 979 *A.*2d 792. We noted that if the defendant's conviction were to be set aside in the PCR proceedings, he would be entitled to a new trial and, if found guilty of capital murder, he would be in the same position as Fortin, subject to life

> without parole only after another penalty phase hearing in which the aggravating factor or factors were found to exist and to outweigh the mitigating. And if [the] defendant were found to have ineffective assistance of counsel at the penalty phase only, or the sentence were otherwise set aside, he would be entitled to a new penalty phase hearing because the result could still impact the sentence. Under *Fortin*, life without parole, as opposed to a sentence with a thirty-year period of parole ineligibility, can only follow a penalty proceeding at which the aggravating factors were found to outweigh the mitigating. [*Fortin IV, supra,*] 198 *N.J.* at 633 [969 *A.*2d 1133]. Otherwise, ex post facto principles would preclude imposition of a sentence of life without parole. [*Id.* at 52, 979 *A.*2d 792.]

> Defendant's reliance upon *Cooper* is misplaced. The defendant in *Cooper*, like the defendant in *Fortin*, was convicted of committing a murder before the statutory amendments enacted in 2000 which allowed the imposition of life sentences without parole if the jury were to find at least one aggravating factor. Defendant in this case is not in the "same position" as the defendants in *Cooper* and *Fortin*. Thus, *Cooper* does not require a new penalty-phase hearing in this case.

*Baylor*, 34 A.3d at 811-814.

The Ex Post Facto Clause of the United States Constitution forbids the enactment of any criminal law which imposes "a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (internal quotation marks and citations omitted). A law that is both retrospective and disadvantages the offender affected by it, violates this rule. *Id.* at 29.

Here, however, Petitioner committed these offenses in 2005 (not prior to 2000). He received the benefit of being spared the death penalty, although he committed what were previously considered capital offenses. Petitioner has not demonstrated how the laws that were in effect in 2005 altered his eligibility for life sentences without parole. Therefore, the Ex Post Facto Clause is not implicated as Petitioner did not receive a greater punishment than the law allowed when he committed the crimes. Consequently, the state court's decision, which

involved the ex post facto clause but hinged on its authoritative exposition of State law, was not an unreasonable application of clearly established federal law. Habeas relief is thus denied.

## V.    CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. *See* Third Circuit Local Appellate Rule 22.1. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right. This Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied and a certificate of appealability shall not issue. An appropriate order will be entered.

Dated: February 5, 2020

KEVIN MCNULTY
United States District Judge